UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RONALD BORSACK,                                          :

              Plaintiff,                   :          04 Civ. 3255 (PAC)

    -against-                                      :

                                             OPINION & ORDER
FORD MOTOR COMPANY,                                :

              Defendant.                  :
-------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

Defendant Ford Motor Company ("Ford") moves for summary judgment dismissing Plaintiff Ronald Borsack's ("Borsack") product liability action. The action arises from the following agreed upon facts:  Borsack's wife, Lesley Borsack, was driving her 1998 Ford Expedition northbound on Route 15, a four lane divided highway in Sparta Township, New Jersey, on the evening of May 8, 2002.  While traveling at a speed between 53 to 65 miles per hour, she swerved to avoid a raccoon in the highway, lost control of the vehicle, and drove into the grass median.  The Ford Expedition rotated counter-clockwise, dug into the bank of the median, and then rolled over four times, before coming to rest in the opposite, southbound lanes of the highway.  Mrs. Borsack was ejected from the vehicle and came to rest on the median, at least 50 feet away from the vehicle.  She died at the scene of the accident.

Borsack alleges that Mrs. Borsack was wearing her seatbelt and that it came unlatched and the driver's side door opened, causing her to be ejected through the door.  According to the Amended Complaint, Mrs. Borsack's injuries were substantially caused by the design defects in the seatbelt and the door latch.  Borsack filed the claim on

April 29, 2004.[1]  The Amended Complaint, filed July 7, 2005, alleges seven causes of action: (1) strict liability, (2) breach of implied warranty, (3) breach of express warranty, (4) negligence, (5) fraud, (6) negligent infliction of emotional distress, and (7) willful and reckless misconduct.

Ford now moves for summary judgment on all claims.  Oral argument was heard March 27, 2007.  Subsequent to the oral argument, Borsack moved to file a second amended complaint to include a claim for punitive damages.  For the reasons discussed below, Ford's motion for summary judgment is denied; and Borsack's motion to amend is denied.

## I. Discussion of Applicable Law

### A. Governing Law

Jurisdiction in this Court is based on diversity.  Accordingly, in making our choice of law, we follow the law of the forum state, New York, to ascertain what law is applicable to this lawsuit.  Under New York's "interest analysis" approach, New York looks to the law of the jurisdiction with the more significant interest in, or relationship to, the dispute.  See White v. ABCO Engineering Corp., 221 F.3d 293, 301 (2d Cir. 2000). "In deciding which state has the prevailing interest, [the court] look[s] only to those facts or contacts that relate to the purpose of the particular laws in conflict. 'Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort.'" AroChem Int'l v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992) (quoting Schultz v. Boy Scouts of Am., Inc., 491 N.Y.S.2d 90, 95 (1985)).  The

---

[1] This case was first assigned to the Honorable Richard C. Casey; it was reassigned to this Court on September 8, 2005.  Before being assigned to this Court, Judge Casey referred all pretrial matters to Magistrate Judge Dolinger.  Borsack filed a motion in limine to exclude alcohol evidence on November 13, 2006, which is currently pending.

following facts point to New Jersey's interest:  Plaintiff is a domiciliary of New Jersey (as was the decedent); the accident and the decedent's death occurred in New Jersey; and the vehicle was shipped to, sold and licensed in New Jersey.  Both parties agree that New Jersey law applies as it has the most significant interest (see Oral Arg. Tr. 2); accordingly, New Jersey law is applicable.

## B. New Jersey Law

While Borsack alleges seven claims, all of them (except express warranty) are subsumed into the first claim of strict liability.  After the enactment of the New Jersey Product Liability Act, "virtually all common law tort claims in New Jersey were combined into a single theory of recovery."  Canty v. Ever-Last Supply Co., 296 N.J. Super. 68, 79 (Super Ct. Law Div. 1996).[2]

As to the strict liability claim, the Amended Complaint alleges that the Ford Expedition's seatbelt and door latch designs rendered the vehicle and its components "unreasonably dangerous for their intended use," because they were not "crashworthy" in violation of New Jersey Product Liability Act, N.J.S.A. § 2A:58C-2. (Am. Compl. ¶¶ 52-67.)  A plaintiff must show that the alleged defect was a "substantial factor" in producing an injury that would not have occurred, or would have been substantially diminished, in the absence of the defect.  See Poliseno v. Gen. Motors Corp., 328 N.J. Super. 41, 54-55 (Super Ct. App. Div. 2000).  Under the statute, manufacturers will not be liable if there was no feasible alternate design when the product left the manufacturer's control.[3]

---

[2] Borsack concedes that New Jersey law controls and these claims are covered by the New Jersey Product Liability Act. (Pl.'s Mem. in Opp. to Summ. J. 1, 3 & 4.)

[3] To establish a design defect at the summary judgment stage, a plaintiff must provide sufficient evidence

"Crashworthiness" is defined as the ability of a motor vehicle to protect its passengers from enhanced injuries after a collision.  See id. at 51 (citing Barris v. Bob's Drag Chutes & Safety Equip., Inc., 685 F.2d 94, 100 (3d Cir. 1982)).  Strict liability is imposed on a manufacturer for injuries sustained in an accident involving a design or manufacturing defect that enhanced the injuries, but did not cause the accident.  See Poliseno, 328 N.J. Super. at 52 (citing Seese v. Volkswagenwerk, A.G., 648 F.2d 833, 839 (3d Cir. 1981), cert. denied, 454 U.S. 867 (1981)).

The manufacturer is liable only for enhanced injuries, that is, injuries over and above the injuries that would have resulted from the accident, absent the alleged design defect.  Poliseno, 328 N.J. Super. at 52 (citing Larsen v. Gen. Motors Corp., 391 F.2d 195, 503 (8th Cir. 1968)).  "Enhanced injury refers to the degree by which a defect aggravates collision injuries beyond those which would have been sustained as a result of the impact or collision absent the defect."  See Poliseno, 328 N.J. Super. at 52  (citing Barris, 685 F.2d at 100).[4]

It is generally agreed that the plaintiff in a crashworthy case has the burden of establishing that the alleged defect was a substantial factor in increasing the harm beyond that which would have resulted from the collision.  See Poliseno, 328 N.J. Super. at 52 (citing Restatement (Third) of Torts: Products Liability § 16 cmt. a (1997)).

---

such that a reasonable jury could find "either that the product's risks outweighed its utility or that the product could have been designed in an alternative manner so as to minimize or eliminate the risk of harm." Lewis v. Am. Cyanamid Co., 155 N.J. 544, 570 (1998).  The plaintiff thus bears a burden to demonstrate "under a risk-utility analysis the existence of an alternative design that is both practical and feasible."  Id. at 571.

[4] The crashworthiness doctrine is also referred to as the "second collision" doctrine, the accident itself being the "first collision," or "enhanced injury" doctrine.  See Poliseno, 328 N.J. Super. at 54-55 (citing Mazda Motor Corp. v. Lindahl, 706 A.2d 526, 530 (Del. 1998)).

## II. Summary Judgment

### A. Ford's Motion

Ford now moves for summary judgment.  Borsack argues that, but for the design defects on the seatbelt and door latch, the decedent would have remained inside the vehicle and would not have been thrown from the vehicle.  Ford contends that Borsack has no competent proof that there was any violation of New Jersey's Product Liability Act.  Ford argues that Borsack cannot establish that the product design of the seatbelt or the door latch was defective; nor that the defects existed when the product left Ford's manufacturing facility; nor that the defects caused injury to a reasonably foreseeable user.  Further, Ford asserts that Borsack cannot prove that there is a safer alternative feasible design which would have prevented the injury, nor has Borsack offered proof to support a risk utility analysis of the alternative design.

### B. Summary Judgment Standard

In a motion for summary judgment, the moving party bears the burden of establishing that there are "no genuine issues of material fact" in dispute and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004).  The moving party may satisfy this burden "by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted).

A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show

that there is no genuine issue as to any material fact . . . ."  <u>Miner v. City of Glens Falls</u>,

999 F.2d 655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted).  A

dispute regarding a material fact is genuine, "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  <u>Aldrich v. Randolph Cent. Sch. Dist.</u>,

963 F.2d 520, 523 (2d Cir. 1992) (quoting <u>Anderson</u>, 477 U.S. at 248).  After discovery,

if the nonmoving party "has failed to make a sufficient showing on an essential element

of [its] case with respect to which [it] has the burden of proof," then summary judgment

is appropriate.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

 The court resolves "all ambiguities and draw[s] all inferences in favor of

the nonmoving party in order to determine how a reasonable jury would decide."

<u>Aldrich</u>, 963 F.2d at 523.  "Viewing the evidence produced in the light most favorable to

the nonmovant, if a rational trier could not find for the nonmovant, then there is no

genuine issue of material fact and entry of summary judgment is appropriate."  <u>Suburban</u>

<u>Propane v. Proctor Gas, Inc.</u>, 953 F.2d 780, 788 (2d Cir. 1992) (citation omitted).

 When a motion for summary judgment is supported by sworn affidavits or

other documentary evidence permitted by Rule 56, the nonmoving party may not rest

"upon the mere allegations or denials of the [nonmoving] party's pleading."  Fed. R. Civ.

P. 56(e); <u>Goenaga v. March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir.

1995).  Rather, "the [nonmoving] party's response, by affidavits or as otherwise provided

in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial" in

order to avoid summary judgment.  Fed. R. Civ. P. 56(e).  "The non-movant cannot

escape summary judgment merely by vaguely asserting the existence of some unspecified

disputed material facts, or defeat the motion through mere speculation or conjecture."

Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted).  Similarly, a party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible.  See Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

## C. Expert Testimony and Summary Judgment

### i. Applicable Law

Ford contends that Borsack's experts' testimony on the defective designs of the seatbelt (Pozzi) and door latch (Gilberg) is inadmissible under Federal Rule of Evidence 702.  If so, there is no genuine issue of material fact and Ford would be entitled to summary judgment.  If admissible, however, then it may be fairly said that there are sufficient questions of fact and that Ford is not entitled to summary judgment.

In these circumstances, the Court must decide questions of admissibility, including expert opinion evidence, on a motion for summary judgment.  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).[5]  This is so because on a summary judgment motion, a "district court properly considers only evidence that would be admissible at trial."  Nora Beverages v. Perrier Group of Am., 164 F.3d 736, 746 (2d Cir. 1998).  Evidence contained in an expert's report therefore must be evaluated under Rule 702 before it is

---

[5] The Second Circuit has held that, in general, Rule 104(a) pretrial evidentiary hearings are "highly desirable" because they allow parties to present expert evidence and conduct cross-examination of the proposed expert.  Borawick v. Shay, 68 F.3d 597, 608 (2d Cir. 1995).  However, "[n]othing in Daubert, or any other Supreme Court or Second Circuit case, mandates that the district court hold a Daubert hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion."  Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 71 (S.D.N.Y. 2001).  If the evidentiary record is well-developed, a Daubert hearing may be unnecessary.  See id. (citing Oddi v. Ford Motor Co., 234 F.3d 136, 154 (3d Cir. 2000) (rejecting plaintiff's argument that in limine Daubert hearing was required when court had reviewed well-developed record which included two depositions, a declaration and an expert report)); Nelson v. Tenn. Gas Pipeline Co., 243 F.3d 244, 249 (6th Cir. 2001) (Daubert hearing not required, especially where record was extensive and Daubert issue was fully briefed by the parties)).

considered in a ruling on the merits of a summary judgment motion.  If a proffer of expert

testimony in the form of an expert report is excluded as inadmissible under Rule 702, the

summary judgment determination is made on a record that does not include that evidence.

Raskin, 125 F.3d at 66-67.

> Federal Rule of Evidence 702 provides:
>
> If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise . . . .

The Supreme Court has characterized the admissibility standard under Rule 702 as

imposing a two-fold task of "ensuring that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand."  Daubert v. Merrell Dow Pharm., Inc., 509

U.S. 579, 597 (1993).  In applying this standard, "the district court functions as the

gatekeeper for expert testimony."  Raskin, 125 F.3d at 66.  A district court should be

particularly mindful of the relevance standard articulated by Daubert: "[e]xpert testimony

which does not relate to any issue in the case is not relevant and ergo, non-helpful."

Daubert, 509 U.S. at 591.  Rule 702 also extends to expert testimony based on technical

or other specialized knowledge.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141

(1999).

> In Daubert, the Supreme Court articulated four factors pertinent to

determining the reliability of an expert's reasoning or methodology: (1) whether the

theory or technique relied on has been tested; (2) whether the theory or technique has

been subjected to peer review and publication; (3) whether there is a known or potential

rate of error and the existence and maintenance of standards controlling the technique's

operation in the case of a particular scientific technique; and (4) whether the theory or

method has been generally accepted by the scientific community.  509 U.S. at 593-94.  In

Kumho Tire, the Court emphasized that this list is non-exclusive, and its application must

be flexible—particularly where, as here, the proffered testimony is based on "technical"

or "other specialized" (rather than "scientific") knowledge.  526 U.S. at 141.

Expert engineering testimony may rest on scientific foundations, the

examination of which invokes the Daubert factors directly, but may also rest on the

personal knowledge or experience of the engineer.  Kumho Tire, 526 U.S. at 150.  In the

latter cases, the Daubert factors may nevertheless be useful in the assessment of

reliability.[6]

Finally, an expert's testimony may not be based purely on speculation or

conjecture, but must be based on the expert's knowledge.  See DiBella v. Hopkins, 403

F.3d 102, 121 (2d Cir. 2005).  As Judge Kaplan explained:

> Certain principles that are especially pertinent to the task at hand flow
> from the requirement that expert testimony be "scientific, technical, or
> other specialized knowledge." First, the requirement of "knowledge"
> guards against the admission of subjective or speculative opinions.
> Second, in requiring that expert testimony be directed to "scientific,
> technical or specialized" knowledge, Rule 702 ensures that expert
> witnesses will not testify about "lay matters which a jury is capable of
> understanding and deciding without the expert's help."

In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (internal

citations omitted).

### ii. Gilberg's Testimony[7]

---

[6] It may, for example, be appropriate for the trial judge to ask "how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community."  Kumho Tire, 526 U.S. at 151.

[7] Gilberg's testimony includes: (1) Preliminary Report, dated July 9, 2006; (2) Supplemental Report, dated October 3, 2006; (3) Deposition Testimony, taken July 10, 2006; and (4) Affidavit, undated.  All are attached as exhibits (22, 14, 11, and 10, respectively) to Borsack's Opposition to Summary Judgment.

Andrew Gilberg opines that the latching system in Mrs. Borsack's 1998 Ford Expedition was defective in design because it was unreasonably dangerous as designed. Ford contends that Mr. Gilberg's testimony lacks foundation. The Court finds that the basis for Gilberg's testimony and opinions are clearly reliable.[8]

Gilberg opines that the driver's side door of Mrs. Borsack's Expedition came unlatched and opened during the rollover due to "fore/aft" crushing of the door frame, inertial forces on the inside handle, or some combination of the two:[9]

> It is my opinion that the door latching system in the Borsack vehicle was defective in design because it was unreasonably dangerous as designed. Based upon my findings the inside handle linkage was activated due to one or a combination of two conditions. [T]he first condition is the absence of the elastomeric bumper on the inside remote control allows the handle to activate due to inertia ["inertial unlatching theory"]. The second condition is supported by physical evidence which indicates the inside handle linkage was placed under compression due to endwise compression of the door ["compression theory"].

---

[8] There is no doubt, indeed Ford does not contest, that Gilberg is more than qualified to address door latch defects. In 2002, the Sixth Circuit thoroughly examined Mr. Gilberg's credentials and reliability in Clark v. Chrysler Corp., 310 F.3d 461, 467-68 (6th Cir. 2002), another door latch defect case, and concluded:

> Mr. Gilberg demonstrated thorough knowledge of automobile door latch systems. Mr. Gilberg received an undergraduate degree in mechanical engineering from Rensselaer Polytechnic Institute and a Masters of Science Degree in mechanical engineering from the University of Michigan. He worked for Ford Motor Company for six years in the area of safety research beginning in 1978. He later worked for a four-year period with Versatech, a consulting company, doing, among other things, accident investigations for insurance companies, attorneys, the automobile industry and local governments. In this capacity, he looked at "how vehicles acted and held up in" accidents and was sometimes involved in reconstructions of accidents.... Eventually, Mr. Gilberg came to study the ejection of occupants from vehicles, including how and why ejections happen. In 1985, he began analyzing cases involving door latch failures. At the time of trial, he was employed by his own company and had been involved in testing door latches for strength and how they failed for twelve years. At that point, almost all of Mr. Gilberg's work dealt with door latches and door latch systems; he had done approximately 200 cases of this type by the time of trial. Second, Mr. Gilberg has done extensive testing on door latches.... For example, Mr. Gilberg has designed a number of fixtures to test door latches. One of Mr. Gilberg's tests was specifically designed to test bypass failure. This test has been used by the NHTSA. The fact that he did not do any specific testing in this case goes to the weight of his testimony and not to its admissibility.

[9] The parties agree that the auto-lock feature was enabled and working properly and that latch-overload is not an issue here.

(Gilberg Aff. ¶ 3 & 5.)[10]

Gilberg reached these conclusions after extensive testing as well as numerous inspections of Mrs. Borsack's Expedition. As to the compression theory, there is a rod that runs between the inside door handle and the door latch. The rod is triggered and moves when the handle is pulled. Gilberg opines that the same movement can occur if the door opening is compressed. Specifically, he states that it takes at least 25 millimeters of compression to trigger the latch. He measured 3 millimeters of residual crush on the door, but states that based on his testing and experience, it is impossible to determine how much reduction occurred in the Expedition during the accident, because "inertia activation doesn't leave evidence as part of its nature." (Gilberg Dep. 29.) He bases the 25-millimeter compression threshold on previous compression testing on a Ford F-series pickup truck, which he confirmed "use[s] the same latching systems and . . . the same latch, which means the movement required to trigger the latch is the same." (Gilberg Dep. 20.)[11]

The inertial unlatching theory is not based on the impact of the crash. Rather, there is inertia acting on the handle that triggers the latch. The chances of this happening are increased where, as here, the latch does not contain an "elastomeric bumper." (Gilberg Aff. ¶ 5.) There would similarly not be evidence of inertial unlatching because "it causes the inside handle to operate as if pulled by the occupant during the normal course." (Id.)

Ford contends that the compression theory testimony is unreliable because

---

[10] Ford's theories are that the door opened due to the inadvertent contact by Mrs. Borsack with the door handle during the rollover or that it opened after Mrs. Borsack was ejected through the window.

[11] Gilberg also built a test set-up for an Expedition in order to determine how much reduction in the door opening would be necessary to cause the door to unlatch from the inside of the vehicle.

Gilberg did not test the exact type of door in the Expedition.  Gilberg, however, tested a substantially similar door to the Expedition door—that used in a Ford F-series pickup truck.  Gilberg testified that that the doors on both vehicles "use the same latch, which means the movement required to trigger the latch is the same."  (Gilberg Dep. 20.)  Ford also takes issue with the lack of specific compression findings during the accident.  That Gilberg could not determine the precise amount of compression acting on the door during the rollover is not fatal to his opinion, rather, it goes to the weight of his opinion.  The same is true for Ford's attack on the inertial unlatching theory.  It is not fatal to Gilberg's opinion that he could not determine the precise magnitude of inertial forces acting on the handle at the time of the accident.  In any event, Gilberg has put forth a reasonable explanation of why precise calculations were not possible.  This evidence is admissible. To the extent that any portion of Gilberg's testimony is weak, as Ford contends, it is axiomatic that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.

### iii. Pozzi's Testimony[12]

Mark Pozzi opines that Mrs. Borsack was properly wearing her seatbelt and that the belt malfunctioned as a result of a design defect, causing her to be ejected from the vehicle.  Ford contends that Pozzi's testimony is inadmissible under Rule 702 and Daubert because it is based on pure speculation.  As a preliminary matter, the Court finds Pozzi's reports to be credible and recognizes his authority as an expert on seatbelt

---

[12] Pozzi's testimony includes: (1) Preliminary Report, dated June 6, 2006; (2) Supplemental Report, dated July 20, 2006; (3) Deposition Testimony, taken August 11, 2006; and (4) Affidavit, dated January 15, 2007. The Preliminary Report, Deposition, and Affidavit are all attached as exhibits (15, 9, and 5, respectively) to Borsack's Opposition to Summary Judgment.  The Supplemental Report is attached as Exhibit 10 to Ford's Motion in Support of Summary Judgment.

defects.[13]

> As to the design defect, Pozzi has opined that:
>
> As a result of my inspections, observations, of the physical evidence, experience and through a scientific process of elimination, I am able to conclude within a reasonable degree of scientific and biochemical certainty that any one of three design and/or manufacturing defects would explain how Mrs. Borsack's belt became unlatched during the accident sequence. These three defects are: 1) inertial unlatching, 2) false latching and 3) inadvertent unlatching.

(Pozzi Aff. ¶ 20.) Pozzi bases this opinion on his examination of "the TRW Type 11 seatbelt buckle found in this vehicle." (Pozzi Report 13.) He asserts the TRW Type 11 "has been demonstrated to be unreliable. This and similar buckle designs has been shown to unlatch in numerous foreseeable collisions, and this defect has been demonstrated in repeated scientific tests." (Id.) At his deposition, however, Pozzi did not testify clearly whether his expert opinion related to the seatbelt used in the Expedition or whether he was testifying about another, but similar, seatbelt product.

> Q:   Okay, What testing have you done of the seatbelt buckle model that was in this vehicle?
> A:   Well, I've tested reasonably similar model seatbelts, and I believe I've done crash testing on several vehicles that contained similar buckles. There's only one that comes to mind that ended up being a rollover, and I brought that with me –
>
> Q:   Okay.
> A:   -- if you wanted to see that. But the rest were various types of SLED and crash tests. So I have tested this type of buckle a number of times in the context of other issues. As far as there's only the one test that was a rollover with a reasonably similar end release buckle. I've investigated a number of cases involving reasonably similar buckles.
>
> Q:   What is your definition of reasonably similar?
> A:   Well, an end release buckle that's not equipped with a lock of a latch that may or may not have an ejection spring to eject the latch plate. Basically, a domestic mark at end release buckle that's intended for use in a passenger vehicle.

---

[13] Ford has not disputed that Pozzi is qualified as an expert on seatbelts.

(Pozzi Dep. 54-55.)  The lack of clarity continues:

> Q:     What model was used in this vehicle?
> A:     It appears to be consistent with a TRW type 11.  I think there's a very slight variance between the type 11 and this one.  I think the outer casing is slightly different, but my understanding is that the internal mechanisms are the same.
>
> Q:     Have you examined the internal mechanisms of this buckle?
> A:     No, not at this point.  I will when I have an opportunity, but I haven't done that yet.
>
> Q:     What is the basis of your understanding that the internal workings of this buckle are the same as the TRW type 11?
> A:     It's my general understanding of buckles that are installed in Ford vehicles of that vintage, that it's generally—that's in the milieu of what Ford was installing in their light trucks at that time.  I haven't gotten any specific discovery information to help me identify this buckle any tighter than that.  If I'm provided with any more specific information, I'll be happy to review that and refine it better . . . .

(Pozzi Dep. 55-56.)  It is clear that Pozzi examined the seatbelt actually in the vehicle, and that he opined that it was frequently used.  It is less clear whether the crash tests he performed were on the type of seatbelt found in the Expedition model or whether the seatbelts used were of another type, the similarity of which he did not bother to ascertain. Pozzi's willingness to do more testing is not sufficient; discovery is now closed.  Ford claims only that TRW never marketed a belt with the designation of "TRW Profile 11," but does not further elaborate.  (Pearson Aff. ¶ 5, attached to Def.'s Reply Mem. in Supp. of Summ. J.)

The record is unclear here as to exactly what Pozzi was testifying to.  In these circumstances, the Court cannot grant summary judgment, but instead recognizes that there is a significant issue left to be determined:  whether the crash tests performed were on the type of seatbelt used on the Expedition model.

If the crash tests that form the basis for Pozzi's opinion did not test the type of seatbelts used in the Expedition model, then they might not be relevant, and the Court may be compelled to exercise its gatekeeping function to exclude this portion of his testimony.  See Daubert, 509 U.S. at 591 (stating that irrelevant expert testimony is not helpful to a jury and should be excluded).  On the other hand, if the subject tests did utilize the type of seatbelt found in the Expedition, those tests would be relevant.  On this record, the Court cannot determine this issue.

There is a far clearer record which will permit Pozzi to testify regarding whether Mrs. Borsack was wearing a seatbelt.  The record reflects that Pozzi conducted thorough examinations of the accident reconstruction and Mrs. Borsack's clothes, and concluded:

> The location, shape and dimensions of this rectangle of witness marks [impressions on Mrs. Borsack's shirt] clearly matches the width and shape of the seat belt webbing . . . . It is my opinion within a reasonable degree of scientific and biomechanical and certainty that [Mrs. Borsack] had the 1998 Expedition's driver torso belt properly deployed across her left shoulder at the initiation of the rollover.

(Pozzi Aff. ¶¶ 16 & 19.)  Ford argues that the absence of any other dirt inside the vehicle proves the unlikelihood of this theory.  This is for a jury to determine.  Pozzi's testimony has created a genuine issue of material fact that precludes summary judgment.  Consequently, these portions of Pozzi's testimony pass muster under Rule 702 and Daubert.

### D. Application of Law and Facts to Plaintiff's Theory of Recovery

### i. Door Latch

Ford does not present any evidence itself.  Instead, it argues that Borsack has no competent evidence from which to conclude that a door latch defect caused it to

open during the rollover because Gilberg's testimony is unreliable.  As the Court has

discussed, however, Gilberg's expert testimony is reliable and admissible, and indeed

creates a genuine issue of material fact as to a latch defect.  Ford further contends that the

claim fails on proximate causation grounds because Borsack cannot show that Mrs.

Borsack would not have been ejected through the window, if not the door.  However, the

expert testimony of both Pozzi and Dr. Ziejewski[14] has created genuine issues of material

of fact as to whether Mrs. Borsack was ejected through the door, as well as the likely

movement of her body had the door not opened.  (See Ziejewski Dep. 70-72; Andrews

Dep. 47.)  Moreover, even if the evidence proves that Mrs. Borsack was moving towards

the window during the rollover, it does not automatically follow that she would have

been ejected through the window or that her injuries would have been identical even if

she would have been ejected through the window.  This, too, is an issue of fact for the

jury to determine.

### ii. Seatbelt

Again, Ford submits no evidence itself, other than an affidavit from a

TRW employee that TRW did not market a seatbelt with the designation of "TRW Profile

II" in the 1990s.  Significantly, Ford does not deny that TRW seatbelts were used; nor

does it suggest what type or types of seatbelts in fact were used in the accident vehicle.

Instead, it emphasizes the lack of precision in Pozzi's deposition and calls his testimony

"speculative."  The Court recognizes the lack of clarity in Pozzi's deposition.  At a time

closer to trial in this matter, the Court will hold a hearing to ascertain whether Pozzi's

expert opinion deals with the seatbelts used in the Expedition vehicle involved in this

---

[14] Dr. Mariusz Ziejewski opines that the decedent was ejected through the door, and that a window ejection
was highly unlikely namely because of the absence of marks on the rubber window stripping on the
vehicle.

accident.  The Court denies the summary judgment motion at this time, subject to

reconsideration, if appropriate, after the <u>Daubert</u> hearing.

     To the extent the issue of whether Mrs. Borsack was wearing her seatbelt

is pertinent to other claims or theories of recovery, the Court finds that there is a genuine

issue of material fact which precludes summary judgment.  Pozzi's conclusion that Mrs.

Borsack was wearing her seatbelt is based on the presence of the compressed dirt on her

shirt shoulder that he opines must have gotten inside the truck during the rollover and in

between her seatbelt strap and her shirt, becoming compressed into her shirt.  Not only is

there Pozzi's testimony concerning the dirt smudges, but Borsack has put forth habit

evidence that Mrs. Borsack consistently wore her seatbelt.  Furthermore, Borsack alleges

that he saw her put on the seatbelt before she left that night.  Pozzi also testified that the

seatbelt's condition was consistent with regular use by the driver.  The most Ford has

done through its alternate interpretations of the evidence is show that there are genuine

issues of fact.

### iii. Design Alternatives

     Ford contends that Borsack has failed to make out a <u>prima</u> <u>facie</u> case of

design defect under New Jersey law because he has not put forth proof of a safer, feasible

design alternative that would have prevented the injuries.  <u>See</u> <u>Lewis</u>, 155 N.J. at 560.  As

the Court has dismissed the seatbelt defect claim, the Court will discuss only the

defective latch claim.  Gilberg opines that "there were safer alternative designs that

would have reduced the risks of the injuries that ended the life of [Mrs. Borsack] which

were feasible at the time that the 1998 Ford Expedition left the control" of Ford.  (Gilberg

Aff. ¶ 3.)  Gilberg adequately identifies three alternative designs:  (1) a design that would

"prevent inertia from causing the inside handle linkage to activate," (2) a design that "prevent[s] door compression from causing the inside handle linkage" activation,[15] and (3) designs that would "prevent every type of door opening short of latch overload," including "a combination of the autolock feature with a non-override latch or a double-pull latch." (Id. ¶¶ 6-9.) Contrary to Ford's bare conclusion, Gilberg's expert testimony indeed provides competent evidence of a feasible design alternative.

Moreover, Ford's contention that Borsack's claim must fail because he has not alleged evidence to support a risk-utility analysis is also misplaced. New Jersey courts have articulated a seven factor test to evaluate risk-utility, however, "the prevalent view is that, unless one or more of the other factors might be relevant in a particular case, the issue upon which most claims will turn is the proof by plaintiff of a 'reasonable alternative design . . . the omission . . . [of which] renders the product not reasonably safe." Cavanaugh v. Skil Corp., 164 N.J. 1, 8 (2000) (quoting Green v. Gen. Motors Corp., 310 N.J. Super. 507, 517-18 (App. Div. 1998)). As discussed above, Borsack has proffered evidence that the Expedition was "not reasonably safe" since there were alternative designs Ford chose not to use.

### III. Plaintiff's Other Claims

At oral argument, Borsack conceded that he is not pursuing claims for negligent infliction of emotional distress or for breach of express warranty. The Court determines that these two claims have been withdrawn, with prejudice. (See Oral Arg.

---

[15] For example:

> a combined tension and compression rod system to activate the latch, an encapsulated latch linkage, a crash sensing latch, a cable release system such as that employed for the inside handles in 1992-1996 Ford pickups, Honda, Porsche, Ferrari, Audi, Nissans and Infinities. An electronic or E-latch needs no mechanical connection between the inside handle and latch.

(Gilberg Aff. ¶ 8.)

Tr. 3.)

## IV. Defendant's Motion for Dismissal/Sanctions

Ford contends that the Court should dismiss all claims or exclude the expert testimony (resulting in summary judgment in favor of Ford) because Borsack failed to preserve the vehicle for Ford to fully inspect. Ford's proposed sanction is disproportionate; and the Court will not dismiss the action. On the other hand, there are numerous evidentiary issues that would be more easily resolved if Borsack had preserved the vehicle. Borsack's explanation that the "insurance company did it" is not satisfactory. The Court invites further briefing on what sanctions, especially in the form of a jury charge, are appropriate.

## V. Plaintiff's Motion to Amend

Finally, Borsack moves to file a Second Amended Complaint to include a claim for punitive damages under New Jersey law; Ford opposes the motion.

Rule 15(a) provides that once a responsive pleading has been served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). A decision to grant or deny a motion to amend is within the sound discretion of the trial court. See Foman v. Davis, 371 U.S. 178, 182 (1962). "Considerations of undue delay, bad faith, and prejudice to the opposing party [are] touchstones of a district court's discretionary authority to deny leave to amend." Barrows v. Forest Labs., 742 F.2d 54, 58 (2d Cir. 1984); see Zahra v. Town of Southold, 48 F.3d 674, 686 (2d Cir. 1995) (affirming denial of leave to amend after request filed two and one-half years after the commencement of action and three months prior to trial). "One of the most important

considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action." H.L. Hayden Co. v. Siemens Med. Sys., 112 F.R.D. 417, 419 (S.D.N.Y. 1986). Furthermore, "[a] proposed amendment . . . [is] especially prejudicial . . . [when] discovery had already been completed and [non-movant] had already filed a motion for summary judgment." Ansam Assocs. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir. 1985) (internal quotation marks and citation omitted).

Justice would not be served if the Court granted Borsack leave to amend. Borsack has not adequately explained the undue delay in bringing this motion to amend. Although he reserved the right in his first complaint to allege a punitive damages claim, Borsack did not attempt to do so until now, over 3 years after this action was initiated, and months after discovery has closed. Borsack himself admits that he has been on notice that a punitive damages claim may be appropriate since at least July 2006. (Pl.'s Apr. 6, 2007 Letter to Court.)

Since discovery has closed, and Ford has filed a summary judgment motion, it would be unduly prejudicial to allow Borsack to amend. See Ansam Assocs., 760 F.2d at 446. This is especially true where Borsack refused to answer discovery requests concerning punitive damages, including interrogatories,[16] and did not attempt to supplement the interrogatory responses concerning punitive damages, even after receiving Gilberg's Report in July 2006, which according to Borsack, provides the basis of the award.[17] To allow this amendment and re-open discovery would only further delay

---

[16] See attachments to Ford's Apr. 23, 2007 Letter to Court, in which Borsack refused to respond to punitive damages interrogatories because they were "premature." Borsack never supplemented these responses.

[17] The proposed amendment would likely be futile given New Jersey's strict standard for punitive damages.

a timely disposition of this case, which has already been pending for 3 years. See H.L.
Hayden Co, 112 F.R.D. at 419.

At this stage of the proceeding, it would not serve the interests of justice to
allow a further amendment of the Amended Complaint to include a new claim for
punitive damages.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is
DENIED. The negligent infliction of emotional distress and breach of express warranty
claims are dismissed with prejudice. Plaintiff's request to file a Second Amended
Complaint to include a claim for punitive damages is DENIED.

Dated: New York, New York
July 26, 2007

SO ORDERED

PAUL A. CROTTY
United States District Judge

---

Moreover, Borsack makes no attempt to show any evidence supporting this claim:

> Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and
> convincing evidence, that the harm suffered was the result of the defendant's acts or
> omissions, and such acts or omissions were actuated by actual malice or accompanied by
> a wanton and willful disregard of persons who foreseeably might be harmed by those acts
> or omissions. This burden of proof may not be satisfied by proof of any degree of
> negligence including gross negligence.

NJ ST 2A:15-5.12 (emphasis added).